(No. 37698.—)

ALLEN M. DORFMAN *et al.*, Appellants, *vs.* JOSEPH S. GERBER, Director of Insurance, Appellee.

*Opinion filed Sept. 27, 1963.—Rehearing denied Nov. 25, 1963.*

STANFORD CLINTON, of Chicago, for appellants.

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES and EDWARD A. BERMAN, Assistant Attorneys General, of counsel,) for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is a proceeding to review an administrative decision of the then Director of Insurance revoking the broker's and agent's licenses of plaintiffs Allen M. Dorfman and Union Insurance Agency of Illinois, the latter a partnership in which Dorfman and his mother are partners, herein referred to as Union. The circuit court of Cook County reversed the revocation order and upon the Director's appeal to the Appellate Court, First District, it reversed the trial court and reinstated the order of the Director. (*Dorfman* v. *Gerber,* 38 Ill. App. 2d 61.) We granted leave to appeal.

The facts are set out in the opinion of the Appellate Court and will be only briefly summarized here. Dorfman entered the insurance field about 1948, and specialized in

group coverage, particularly locals of international unions. His business grew rapidly and by the middle of 1959 he had written over $100,000,000 in premiums and was collecting in excess of $1,000,000 in premiums per month. In May 1953 Union, through Dorfman, entered into a general agency agreement for group coverage with an insurance company, now named Northeastern Life Insurance Company of New York. The agreement contained typical general agency provisions such as making reports and collecting and transmitting premiums. Union writes approximately 90% of the insurance company's business under that agreement.

One of the group policies contained a provision that when any of the assureds were laid off from work they were permitted to make small monthly payments called "layoff premiums" to keep their insurance in force. These payments, averaging $4 to $5 each, were paid to Union and remitted daily to the company. In May 1954, the company complained about the volume and expense of handling layoff premiums and instructed Union to accumulate them and remit periodically. In the following three years Union collected approximately $51,461 in layoff funds. None of these funds were remitted to the company until March 11, 1957. At that time a check for $39,155.33 accompanied by a check list of over 10,000 names of individuals who had paid layoff premiums aggregating that sum was mailed to the company. On June 21, 1957, a check for $12,306.31 was drawn payable to the company to cover the remainder of the layoff collections, but it was deposited to Dorfman's personal account. Several months later this erroneous deposit was discovered and the amount transmitted to the insurance company. Both checks were drawn on the fiduciary premium account of Union, which had been established in early 1957, and the deposits making up the $51,461 came from other accounts of Dorfman or Union. The detailed data with respect to the layoff premiums was given and remittances made to the in-

surance company before an investigation by the Director, the company or any agency of government.

Under both the terms of the agency agreement and section 505 of the Illinois Insurance Code (Ill. Rev. Stat. 1959, chap. 73, par. 1065.52) that portion of premiums payable to the company is held by an agent in a fiduciary capacity. Section 502 of the Code (par. 1065.49) provides for suspension for not to exceed 2 years, or revocation of a license or a penalty payment of not to exceed $500, upon certain findings being made by the Director of Insurance. The grounds, *inter alia,* for disciplinary action are delinquency in remittance of premiums within 90 days, conversion of funds held in a fiduciary capacity and failure to demonstrate trustworthiness in such manner as to safeguard the public.

The hearing officer found that Union was more than 90 days delinquent in remitting premiums to Northeastern, that Dorfman fraudulently converted to his own use or illegally withheld fiduciary monies and that Dorfman fraudulently endorsed Union's check for $12,306.31 to the insurance company and deposited it to his personal account.

While the record shows that layoff premiums were not segregated and were commingled with other funds and that more than 90 days elapsed before remittance of premiums, it also disclosed some other interesting and undisputed facts. All regular premiums (as differentiated from layoff premiums) amounting to more than one million dollars a month were remitted daily. At all times the credit balance due the agency for commissions was far in excess of the layoff premiums held, the excess being over $100,000 at the time of the hearing. The agency's bank balances always exceeded the aggregate of the layoff premiums, and at the time of the hearing amounted to between $100,000 and $130,000.

The handling of the balance of the layoff premiums in the sum of $12,306.31 by Dorfman does not show an intent

to misappropriate or convert the amount to his own use. When one of his employees found that the funds had been deposited to his personal account, Dorfman made immediate arrangements to have that amount sent to the insurance company. The only evidence concerning this transaction was introduced by the Department and consisted of testimony of a bank officer that a mistake had been made by the bank, and introduction of a letter from the bank to the insurance company admitting its mistake.

Plaintiffs freely admit that the layoff funds were not segregated but commingled with monies in other accounts of the agency. Much is made of Dorfman's testimony relative to his right to use all of these funds. However, it seems apparent from a careful reading of the record that the witness Dorfman, in concurring with his counsel's statement that he could use the layoff funds as his own, was referring to his right to withdraw funds from the various agency accounts which contained the $51,461 rather than his right to use those specific funds for his own purposes.

The company never raised any question about the failure to remit the layoff premiums. Its comptroller testified that it was in large measure due to the company's neglect that the layoff premiums were permitted to accumulate and that Dorfman was the first to call attention to the accumulation. Under these circumstances the elements of fraud are totally lacking and the findings of fraudulent misappropriation and conversion are contrary to the manifest weight of the evidence and cannot be sustained. Nor does the record substantiate the finding that Dorfman failed to demonstrate trustworthiness and competency to transact insurance business in such a manner as to safeguard the public.

This leaves for consideration the failure of Union to transmit layoff premiums to the insurance carrier within 90 days as provided by the Insurance Code. While plaintiffs again freely admit that they were delinquent in remitting these premiums for more than 90 days, they argue that the

statutory time limitation is solely for the benefit of the insurance company and that the company could and did waive it. We agree with the Appellate Court that the remittance provision is for the benefit of the public as well as the company and that waiver by the latter could not relieve plaintiffs of its statutory duty. However, the situation is complicated by the fact that there was at all times a credit balance in favor of the agency. True, the agency did not have specific authority in the agreement to offset amounts due the company by amounts due it (although the company had such a right,) nor did it attempt to offset, but the existence of a consistent credit balance was certainly an important factor here.

The courts have been most careful to avoid encroaching upon the discretionary power lodged in a public officer. That does not mean, however, that they are helpless and that all administrative decisions are sacred and not within reach of the courts. Where an administrative order is against the manifest weight of the evidence, (*Bruce* v. *Dept. of Registration and Education,* 26 Ill.2d 612; *Menning* v. *Dept. of Registration and Education,* 14 Ill.2d 553; *Harrison* v. *Civil Service Com.* 1 Ill.2d 137,) or the officer has acted arbitrarily and capriciously and thereby abused the discretionary power vested in him, we will not hesitate to intervene. *Investors Syndicate* v. *Hughes,* 378 Ill. 413; *People ex rel. Woll* v. *Graber,* 394 Ill. 362.

The books and records of these plaintiffs were subjected to the closest scrutiny by teams of investigators for a period of more than a year, yet the only irregularity shown by the record was the retention of the layoff premiums which constituted approximately $\frac{1}{20}$ of 1% of total premiums collected for the period. Accurate and detailed records were kept of all transactions of the agency and they were furnished to the company in accordance with the agency agreement. The layoff premiums were remitted daily until the company requested that they be held and sent in only peri-

odically. Dorfman himself called attention to the accumulated funds, took steps to segregate these funds from the other accounts of the agency, and remitted the entire accumulation with detailed data as to the source of the funds shortly thereafter.

In the face of such an undisputed record the Department's hearing officer found fraudulent misappropriation and conversion of funds, when at the very most it showed a technical violation of the 90-day delinquency provision. Upon such a record the hearing officer recommended revocation of both the agency license and the individuals' licenses. Both the findings and recommendation of the hearing officer were adopted by the then Director of Insurance. In our opinion the findings and order of revocation are not supported by the record, and were clearly arbitrary and capricious and constituted an abuse of discretionary power. We see no useful purpose in discussing the motives which plaintiffs claim prompted the revocation order.

The judgment of the Appellate Court, First District, and the order of the Director of Insurance of the State of Illinois are reversed, and the judgment order of the circuit court of Cook County is affirmed.

*Appellate Court reversed;
circuit court affirmed.*